BOULDIN v. ALEXANDER.

1. When a person conveys in fee to persons whom he names a lot and church edifice upon it for the use of a Baptist church—an unincorporated religious body—specified, the trustees are not removable at the will of the *cestui que trusts* and without cause shown.

2. Although a withdrawal by one part of a church congregation from the original body of it and uniting with another church or denomination is a relinquishment of all rights in the church abandoned,—the mere assemblage in a church (as *ex. gr.*, the Baptist) where the congregational form of government prevails, of a majority of a congregation forcibly and illegally excluded by a minority from a church edifice in which as part of the congregation they had been rightfully worshipping, in an-

other place—the majority thus excluded maintaining still the old church organization, the same trustees, and the same deacons—is not such a relinquishment; and the majority thus excluded may assert, through the civil courts, their rights to the church property.

3. Although the civil courts will not in the case of persons excommunicated by competent church authority go behind that authority and inquire whether the persons have been regularly or irregularly excommunicated; the said courts may inquire whether the expulsion was the act of the church or of persons who were not the church, and who, consequently, had no right to excommunicate any one.

4 In a congregational church, the majority, if they adhere to the organization and to the doctrines, represent the church.

5. Trustees of the church property are not necessarily, in the Baptist church, communing members; and accordingly excommunication from communing membership does not disqualify them, even if the excision be rightful; which in the present case, having been of a majority by a minority, it was held not to have been.

APPEAL from the Supreme Court of the District of Columbia, in a case arising out of a controversy in an unincorporated religious society of colored persons, in Washington, calling themselves the " Third Baptist Church." The case was thus:

From about the 1st of September, 1857, a small number of colored persons were in the habit of consociating in prayer-meetings and other religious conferences at the house of one Albert Bouldin, a colored man from Virginia, who had been licensed to preach, and was so styled the Reverend Albert Bouldin; he being always a chief actor in the assemblages. The persons were, at first, few in number, feeble in resources, and without any church edifice. But under Bouldin's leadership they increased in strength, and, after a certain time, went to work to raise money to build a meeting-house; Bouldin taking the lead in the whole matter, the temporal part as much as the spiritual, and being at once pastor, collector, treasurer, chief agent, and actor in the enterprise, and getting into his own hands most of the moneys collected. Having bought a lot on which to build a church, he took a deed for it in his own name, and proceeded to have the church built, which under his superintendence was done; a building now standing, on the corner of Fourth

and L Streets, northwest.   Some of the chief persons in the work, however, were apparently dissatisfied with Bouldin's having the title to the property in his own name.   Hereupon, April 1st, 1864, he and his wife conveyed a large part of the lot, including that on which the church was built, but apparently not the whole of the lot, to four persons, Joseph Alexander, Charles Alexander, John Middleton, and William Minor, as trustees, to be used, with the buildings on it, as " the Third Colored Baptist Church of the City of Washington;" these persons, in return, giving him their promissory notes and a deed of trust on the property to secure them; the notes being for a sum which Bouldin represented to them that he was in advance from his private funds beyond moneys received by him from collections.

A congregation had by this time been organized with sufficient regularity and in full conformity with the constitution of the general Baptist Church of the United States, in which, as is known, the congregational form of government prevails; and there was at this time no serious dissensions in the particular Third Church of which we are speaking. " The Rules of Church Order," making part of the Baptist Manual, an authoritative book in the Baptist church generally, required that " seven trustees" should be elected in January of each year, but provided that in case of any omission to hold an election then, the election should be held " at the next regular meeting for business."   And the minutes of this church, which had been kept apparently with essential order, though not in a highly clerical style, by Bouldin, one Lee, or some other person elected as clerk, from the origin of the church till the time when some troubles, hereinafter mentioned, arose, showed that seven persons, Joseph Alexander, Henry Watson, Henry Scott, John Wiggins, John Middleton, William Laws, and W. J. Minor, were duly elected trustees, at a regular meeting of the church for business, on the 15th of February, 1867; the ordinary meeting, apparently, not having been held.   These persons, the minute-book showed, had received about 200 votes of a not much larger number cast.   After the troubles

above referred to arose, the minute-book passed from one hand to another, and Bouldin swore in the court below that this minute about the election was a forgery; and that no such election had ever taken place. The books were brought into this court, and showed some erasures and the cutting out apparently of some leaves, but little or nothing beyond Bouldin's statement to prove that this particular minute was not entitled to as much respect as others in the book. Minutes following it were made by Bouldin himself.

Very soon after the completion of the church edifice, already mentioned, dissensions arose in the congregation, and the church was divided into two parties, each asserting itself to be the true "Third Colored Baptist Church." On the 7th of June, 1867, one of these parties, being a very small minority of the church, and being probably about fifteen in number, including Bouldin, resolved to "turn out" four trustees, without naming them, and proceeded to elect four others in their stead. The persons thus elected were Manson Robinson, Julius Bouldin, William Pearson, and Charles Pearson. The attempted ejection of the old trustees was without citation, trial, or charges preferred. It was also, the reader will observe, at a time when, according to the rules of the church, an election of trustees was not in order; the rules that exist in Baptist churches generally, providing, as already mentioned, that trustees shall be elected in January of every year, or in case of failure to hold the election, at the next regular meeting for business. A few days afterwards, on the 10th or 17th of June, 1867, the same minority proceeded to "turn out" forty-one members of the church, also without citation or trial. Having thus got the control of the church property in their own hands, some of the persons elected to be trustees in place of former trustees caused the locks to be taken from the church doors, and new locks to be put on in their places, and they with Bouldin claimed and retained possession of the property from that time forth. Hereupon the four persons to whom Bouldin and wife had conveyed the property in trust and the seven that had been elected trustees in February,

1867, worshipped in a school-house or in a place called Miller's Hall; retaining the old organization, with a new preacher named Jefferson, who had been licensed under Bouldin, and who (Bouldin having been dismissed by the party shut out from the church), was now acting temporarily as preacher, or by way of "supply." Such was the condition of things in the summer of 1867.

On the 28th of September of that year the four trustees named in the deed of the church lot, from Bouldin and wife, and also the seven persons who professed to have been elected trustees of the church, on the 15th of February, 1867, at the annual election provided for by the general rules of Baptist churches, filed a bill against Bouldin, who had received the money of the church, and who also professed to be a trustee, without, however, any election, and against three of the persons who professed to have been elected trustees at the meeting of the minority on the 7th of June, who took possession of the church, together with some other trustees in deeds of trust for Bouldin. The bill sought a discovery, and an account of the money received and expended by Bouldin, a release of deeds of trust of the church property given to secure notes held by Bouldin, a surrender and cancellation of the notes, alleging them to have been satisfied, and the restoration of possession of the church property to the complainants as the lawful trustees. It sought also an injunction against future interference by the defendants with the church property, against the sale of the notes, and against sale or foreclosure under the deed of trust. The bill charged that there was a plain mistake in the deed from Bouldin and wife, to the trustees of the church, which it prayed to have corrected. In the court below a decree was rendered in favor of the complainants, sustaining all their claims except that reference was made to a master to ascertain and report the state of accounts. From that decree this appeal came.

The appellants now contended:

1st. That the court erroneously decided that the com-

plainants were, at the time of the commencement of the suit, the legally constituted trustees of the church.

2d. That the complainants, and those who acted with them, withdrew from the church and formed a new congregation, and had so relinquished all their rights in the Third Colored Baptist Church.

It may be observed as part of the history of the case, that after this bill was filed, but before the evidence was taken, both of the organizations had applied for admission in 1867 to the Philadelphia Baptist Association, an ancient authoritative body of the Baptist Church, holding in that year its 160th anniversary. The body declared that the dispute was complicated, and that the applications required consideration and examination, and so declined to admit either party to its then session. At its session of 1868, however—Bouldin himself being heard, and the whole subject having been argued by Horatio Gates Jones, Esquire, of the bar of Philadelphia, and by other members of the Association—the body declared that Bouldin had been in fault, and that the Third Baptist Church should be represented in the body by the now complainants. The record of the Association read thus:

"Mr. Bouldin and party, being greatly in the minority, excluded all the trustees, and all the deacons, and about two hundred other members; the vote being cast by about fifteen members present, without the usual form of citation and opportunity of self-defence. Mr. Bouldin and his adherents now occupy for public worship the house on Fourth Street, of which the trustees above named* have not been legally dispossessed. When the controversy commenced, the aggrieved party† proposed to have the matter referred to arbitration; but Mr. Bouldin, though advised by President G. W. Samson and other white brethren to consent to this arrangement, refused. The aggrieved majority then submitted the case to an ecclesiastical council, which met May 4th, 1868, to which all contiguous Baptist churches were invited to send delegates, seventeen churches

---

* These were the four trustees mentioned in the deed of Bouldin and wife and the seven elected February 15th, 1867.—REP.

† These were the complainants and their friends.

in all.   After deliberate investigation, this council unanimously designated the party represented by the trustees above named to be the Third Colored Baptist Church of Washington.   We therefore recommend that the letter which these brethren bring be received as the letter of the Third Baptist Church of Washington to this Association."

*Messrs. Moore and Riddle, for the appellants; Mr. Thomas Wilson, contra.*

Mr. Justice STRONG delivered the opinion of the court.

It is contended that the court erroneously decided the complainants were, at the time of the commencement of the suit, the legally constituted trustees of the church.   But it is very evident that Joseph Alexander, Charles Alexander, John Middleton, and William Minor were then trustees for the church of the church property, unless they had been removed by the action of the minority on the 7th of June, 1867.   They were nominated as trustees in the deed from Bouldin and wife, and they had never surrendered or renounced their trust.   And we think the evidence is satisfactory, that Joseph Alexander, Henry Watson, Henry Scott, John Wiggins, John Middleton, William Laws, and Willis J. Minor were then general trustees of the church, unless they, or some of them, had been removed by the action of the same minority, on the day last mentioned.   It is not to be overlooked that we are not now called upon to decide who were church officers.   The case involves no such question.   What we have to decide is, where was the legal ownership of the property.   The question respects temporalities, and temporalities alone.   That the attempt made on the 7th of June, 1867, to remove the trustees then holding was inoperative, is not to be doubted in view of the facts of the case.   Those who held under the deed were not removable at the will of the *cestui que use,* and without cause.   And had there been cause, none was shown.   No ecclesiastical authority has decided that the defendants, or any of them, were legitimate trustees of the church, or of its property.   Even if it be assumed that it was in the power of the church

to substitute other trustees for those named in the deed, it may not be admitted that a small minority of the church, convened without notice of their intention, in the absence of the trustees, and without any complaint against them, or notice of complaint, could divest them of their legal interest and substitute other persons to the enjoyment of their rights.

It is equally true that the seven persons who sue as church trustees were not removed by the action of the minority meeting held on the 7th of June, 1867. Indeed that action does not seem to have been an attempt to remove them. It was voted to turn out four trustees, but who the trustees intended were nowhere appears. None were named. In view of the fact that the number was four, it is presumable the meeting had in view the four trustees of the church lot, named in Bouldin's deed, and not the ordinary trustees of the church, those contemplated by the Baptist Church Manual. That Manual provides, that in every church seven trustees shall be elected annually, in January, or at the next regular church meeting thereafter. And the church books, which appear to have been kept with considerable regularity from September 2d, 1857, until this controversy arose, show that on the 15th of February, 1867, at a regular church meeting, the seven persons who with the church-lot trustees are complainants in this bill, were elected trustees of the church for the ensuing year. This was before any division took place in the society. It is true, Mr. Bouldin testified that the minute of an election is a forgery, and that no such election ever took place. But we are satisfied that he is mistaken. An examination of the minute-book leaves no doubt in our minds that the election was made as claimed by the complainants, and that they were elected by a number of votes averaging more than two hundred. The entry in the minute-book is attested by the church clerk. It is in regular order, and there are subsequent minutes in the same book made by Bouldin himself. The court below was, therefore, as we think, not in error in holding that the complainants were the legally constituted trustees at the time when this suit was commenced. And if they were the right-

ful trustees, the decree for an account, for the surrender of the church property, and indeed the entire decree made by the court, was a matter of course upon the evidence.

But the appellants insist that the complainants and those who acted with them, withdrew from the church and formed a new congregation. This, they argue, was a relinquishment of all their rights in the Third Colored Baptist Church. It may be conceded, that withdrawal from a church and uniting with another church or denomination, is a relinquishment of all rights in the church abandoned. But there is no sufficient evidence in this case that any new congregation was formed, or that there was any withdrawal from the church, or union with any other. The complainants, and those who acted with them, after the church building had been wrested from the custody and control of the rightful trustees, and after very many of them had been excommunicated in mass by the small minority, held their religious services at another place. But they formed no new organization. They still had the same trustees, the same deacons, and they claimed to be the Third Colored Baptist Church, and as such they were recognized by councils of Baptist churches duly called, and by the Philadelphia Baptist Association, an ecclesiastical body with which the church was associated. That body, it is true, was not a judicatory. Its action was not conclusive of any rights. But the fact that the complainants and those acting with them applied for recognition as the Third Colored Baptist Church, and that the Association thus recognized them, is persuasive evidence that they were not seceders, and that their rights have not been forfeited.

This is not a question of membership of the church, nor of the rights of members as such. It may be conceded that we have no power to revise or question ordinary acts of church discipline, or of excision from membership. We have only to do with rights of property. As was said in *Shannon* v. *Frost,*[*] we cannot decide who ought to be mem-

---

[*] 3 B. Monroe, 253.

Syllabus.

bers of the church, nor whether the excommunicated have been regularly or irregularly cut off. We must take the fact of excommunication as conclusive proof that the persons exscinded are not members. But we may inquire whether the resolution of expulsion was the act of the church, or of persons who were not the church and who consequently had no right to excommunicate others. And, thus inquiring, we hold that the action of the small minority, on the 7th and 10th of June, 1867, by which the old trustees were attempted to be removed, and by which a large number of the church members were attempted to be exscinded, was not the action of the church, and that it was wholly inoperative. In a congregational church, the majority, if they adhere to the organization and to the doctrines, represent the church. An expulsion of the majority by a minority is a void act. We need not, however, dwell upon this. Certain it is, that trustees are not necessarily communing members of the church. Excommunication from communing membership does not disqualify them, even if the excision be regular. Still more certain is it that they cannot be removed from their trusteeship by a minority of the church society or meeting, without warning, and acting without charges, without citation or trial, and in direct contravention of the church rules.

DECREE AFFIRMED.