**Milford HAWKINS, Robert McGowan, and Henry Smith, Appellants,**

v.

**FRIENDSHIP MISSIONARY BAPTIST CHURCH, and Leroy J. Bailey, Individually and as Chairman of the Church Body, Appellees.**

No. 14–01–00138–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 7, 2002.

Kenneth H. Kelling, Huntsville, for appellants.

Donald L. Kraemen, Huntsville, for appellees.

\* Senior Justice Don Wittig sitting by assignment.

1. The temporary injunction requires that the Deacons desist and refrain from (1) attempt-

Panel consists of Justices YATES, EDELMAN, and WITTIG.*

## MAJORITY OPINION

RICHARD H. EDELMAN, Justice.

In this church governance dispute, Milford Hawkins, Robert McGowan, and Henry Smith (collectively, the "Deacons") appeal a temporary injunction entered in favor of the Friendship Missionary Baptist Church (the "Church") and Leroy J. Bailey, individually and as Chairman of the Church body (collectively, "Bailey"), on the grounds that the trial court: (1) lacked subject matter jurisdiction over this ecclesiastical matter; and (2) abused its discretion in granting the temporary injunction. We reverse and dismiss.

### Background

After a dispute arose among the parties, the Church and Bailey sought injunctive relief to prohibit the Deacons from interfering with Bailey serving as Pastor of the Church or expending church funds, and from refusing Bailey or the Church body access to Church property and records. In response, the Deacons filed a plea in abatement and motion to dismiss arguing that Bailey had no authority or legal capacity to bring suit on behalf of the Church; the Deacons were not liable in the individual capacities in which they had been sued; and the trial court had no subject matter jurisdiction to hear the case because it concerned ecclesiastical decisions that were made by the duly empowered Board of Deacons of the Church (the "Board"). The trial court denied the Deacons' plea and motion and granted the temporary injunction (the "injunction") sought by the Church and Bailey.[1] The

ing to dismiss Bailey as pastor of the Church without authorization from the Church body; (2) taking action to prevent Bailey from pastoring the Church; (3) taking action to ex-

injunction was based on the trial court's finding therein that the Church "is a congregational form of church government, [and] that the congregation, through its meeting of church membership is the governing authority."[2]

## Subject Matter Jurisdiction

On appeal, the Deacons' first issue reiterates that the trial court lacked subject matter jurisdiction to hear this case because it involves an ecclesiastical matter relating to the firing of a minister by the Board which has historically governed the Church. The Church and Bailey argue that a determination of which group within a church has authority to make decisions is a non-ecclesiastical matter which the courts have jurisdiction to decide.

The First Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, provides: "Congress shall make no law respecting an establishment of Religion, or prohibiting the free exercise thereof." U.S. CONST. amends. I, XIV; see

Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Therefore, among other things, the First Amendment prohibits civil courts from resolving church disputes on the basis of religious doctrine and practice. Jones v. Wolf, 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). Similarly:

> civil courts do not inquire whether the relevant [hierarchical] church governing body has power under religious law [to decide such a dispute].... Such a determination ... frequently necessitates the interpretation of ambiguous religious law and usage. To permit civil courts to probe deeply enough into the allocation of power within a [hierarchical] church as to decide ... religious law [governing church polity] ... would violate the First Amendment in much the same manner as civil determination of religious doctrine.

Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 708–09, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (citations omitted).[3] However, a state may adopt an

clude Bailey from the Church grounds; (4) threatening to have arrested, or causing to be arrested, Bailey because of his presence on the Church property; (5) expending Church funds; and (6) refusing access by Bailey or the Church body to: (a) keys to the locks of the Church, (b) keys to the Church's vehicles, (c) keys to the Church's post office, (d) keys to the Church's safety deposit box, (e) the Church's gasoline credit cards, (f) the Church's bank statements, (g) the Church's checking accounts and checkbooks, (h) the Church's financial records, and (i) any other Church records.

**2.** Churches which are governed primarily by their members are described as "congregational" whereas those which are governed primarily by a larger religious institution are described as "hierarchical." See, e.g., Green v. Westgate Apostolic Church, 808 S.W.2d 547, 550–51 (Tex.App.—Austin 1991, writ denied).

**3.** See Smith v. Clark, 185 Misc.2d 1, 709 N.Y.S.2d 354, 358–59 (2000) (holding that

court has no jurisdiction to decide whether former administrator of church had authority to enter into employment agreement or whether a pastor has the authority to terminate an employee holding a ministry position because such a determination would require the court to delve into the religious cannons and laws of the rights of an administrator versus a pastor); Parish of the Advent v. Protestant Episcopal Diocese of Mass., 426 Mass. 268, 688 N.E.2d 923, 933 (1997) (holding that court has no jurisdiction to decide church governance, even though whoever controls a church has control over its assets, because when resolution of a religious dispute affects the control of church property in addition to the structure and administration of the church, the case involves an ecclesiastical matter); Rolfe v. Parker, 968 S.W.2d 178, 181–84 (Mo.Ct.App.1998) (holding that court has no jurisdiction to decide which body, the Quorum of Apostles or the administrative committee, was the legally constituted authority of the church and had ultimate authority

approach, including neutral principles of law, for resolving church disputes that involve no consideration of doctrinal matters. *Jones,* 443 U.S. at 604, 99 S.Ct. 3020. Under such an approach, a court may interpret church documents, such as a church constitution, in purely secular terms without relying on religious precepts in resolving the conflict. *Id.* at 604, 99 S.Ct. 3020.[4] However, if the matter cannot be determined by the court without resolving a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body. *Id.*

 In this case, there is no Church constitution, by-laws, or other document indicating how or by whom the Church is to be governed. The trial court based its granting of the injunction on: (1) the testimony of Church members and current and former church office holders regarding past practices; and (2) a determination that the Church is congregational. However, it is undisputed that the Deacons held some position of authority within the Church, and the fact that the Church is congregational does not establish what powers, if any, the Deacons held within the Church's congregational form of government, under what circumstances those powers could have been revoked or over-ridden, if at all, by the congregation, or

whether any such conditions were met in this case.[5] Without governing Church documents which could be construed in purely secular terms, the power struggle between the Church, Deacons, and Pastor cannot be resolved based only on neutral principles of law, but apparently only by delving into religious doctrine or polity. Because we therefore agree with the Deacons that this dispute involves an ecclesiastical matter, we sustain their first point of error and need not address their second point of error challenging the injunction on the merits. Accordingly, we reverse the trial court's judgement and dismiss the case.

WITTIG, Justice, dissents.

WITTIG, Justice (Assigned), dissenting.

Today's majority opinion undermines the very freedom of religion it espouses. By denying all jurisdiction, the opinion implicitly allows a renegade minority of three to lock out the congregation from its own church. Thus, the opinion relegates this congregational church to "self help." The majority opinion ignores the clear rule requiring deference to the decision of the highest church authority. Quizzically, the opinion refuses to abide by the "majority rule" found in the primary precedent it purports to rely upon. Consequently, I am constrained to respectfully dissent.

---

over the affairs of the church because such a determination concerns doctrine, creed, or form of worship of the church). Even if wrongs exist in the ecclesiastical setting, and the administration of a church is inadequate to provide a remedy, the preservation of the free exercise of religion is deemed so important a principle that it overshadows the inequities that may result from its liberal application. *Williams v. Gleason,* 26 S.W.3d 54, 58–59 (Tex.App.—Houston [14th Dist.] 2000, pet. denied), *cert denied,* 533 U.S. 902, 121 S.Ct. 2242, 150 L.Ed.2d 231 (2001); *Patterson v. Southwestern Baptist Theological Seminary,* 858 S.W.2d 602, 605 (Tex.App.—Fort Worth 1993, no writ) (holding that court cannot de-

cide whether a church complied with its own procedural rules in removing a bishop).

4. *See Green,* 808 S.W.2d at 552 (concluding that trial court correctly awarded church property to the appellees because they were the duly authorized church board under the governing church bylaws).

5. We do not agree with the dissent that a congregational form of church government necessarily means that *any* decision within the church must or can be made by a majority vote of the congregation.

Contrary to the congregation's desires, Deacon Hawkins and four cohorts attempted to takeover the Friendship Missionary Baptist Church. The attempted takeover of the facilities and finances of the Church included a try to remove Pastor Bailey and the lock out of the congregation. The dissident deacons seized all the keys, changed the locks, took the books and credit cards. The deacons also invoked the Walker county sheriff and local police offices in furtherance of their plan. Now, Hawkins and his two fellow appellants claim the courts should not review their extra-legal activities.

Appellants bring two issues. First, appellants, three former deacons[1] of the Friendship Missionary Baptist Church, claim the trial court lacked subject matter jurisdiction under the First and Fourteenth Amendments of the U.S. Constitution, because the case involved ecclesiastical matters. Secondly, they assert the trial court abused its discretion in granting a mandatory injunction, *pendete lite*. Under. Texas law, in a church property dispute, particularly those involving threatened breeches of the peace, civil courts have jurisdiction to fashion remedies to protect rights of property and religion. On that foundation, I would affirm the judgment of the trial court.

## Background

The dispute began in November 1999 when five dissident deacons (three of whom are appellants) used the offices of the sheriff to "serve" Pastor Bailey with their unsanctioned and unauthorized resolution attempting to remove the pastor.

The deacons previously met to discuss the removal of the pastor and to invoke civil authorities.[2] Appellants also invoked county authorities by phone calls to Victor Graham, Sheriff of Walker County, and by a letter from a Huntsville attorney. In the attorney's letter, the deacons' lawyer told pastor Leroy Bailey, Sr., he was excluded from the church property. Pastor Bailey was also threatened by the lawyer with arrest and criminal prosecution[3] if he remained or entered upon the church property. The Sheriff was copied with this letter.

Contemporaneously, the deacons changed the locks on the church doors, and took possession of much property including the car keys, keys to the post office box, keys to the safety deposit box, credit cards, bank statements, check accounts and checkbooks, church financial and other records. Congregation members also testified to the presence of "police" preventing entry into the church. During the lock out, members of the congregation were denied church access for choir practice, foster child care meetings and youth meetings.

One of the five person minority that seized control of the church property, Deacon Jones, recanted his participation in the coup. Jones told the congregation that he was tricked into signing papers attempting to remove the pastor. Jones was told by the other deacons he was signing "insurance papers." Jones apologized to the congregation and was spared the fate of the other four deacons. In a meeting of December 7, 1999, the church

1. The deacons involved in the controversy were removed from office by the congregation's meeting and resolutions of December 14, 1999. For brevity and clarity, they will still be referred to as deacons.

2. The sheriff, in this context, is a "civil authority" in contradistinction to ecclesiastical authority.

3. The threat of arrest and prosecution was under TEX. PEN.CODE ANN. § 30.05 (VERNON SUPP. 2002).

body removed the four dissidents from their positions as deacons of the Friendship Missionary Baptist Church. This majority decision of the body was duly recorded in the minutes of the church and admitted into evidence before the trial court. This meeting was also moderated and attended by four members of the Central District. (Because the church is congregational and not hierarchical, the membership itself is the final voice of the church and its "own sovereignty." Thus, the moderators were only observers.)

The record also reveals the reason the appellants refused to follow the congregational authority and the rule of majority vote. Appellants knew they lacked the votes to prevail by majority vote.

The trial court patiently held multiple hearings alternating between taking evidence and testimony and recessing to allow on going settlement talks. Almost one year after the filing of the original petition and injunction request, the trial court was constrained to enter its injunction order, pending trial. The district court's order made several salient factual findings that are unchallenged by appellants, and sidestepped by the majority opinion. In the injunction order, the court found appellee Friendship Missionary Baptist Church has the congregational form of church government and as such the membership is the governing authority. (This fact and law are ignored by the majority opinion.) Elsewhere in the record it is clear that the membership is also the highest authority of the church. *See, e.g., First Baptist Church of Paris v. Fort,* 93 Tex. 215, 54 S.W. 892, 896 (1900) (ultimate decision-making authority of congregational church may vest in its members) (also ignored by majority). The trial court also found that the three appellants were taking unauthorized action in attempting to remove Pastor Bailey, threatening his arrest and denying access of the church body to its own church.[4] Appellants were found to have refused access to the plaintiff "and the church body to physical assets and property of the church." The court accordingly ordered appellants to desist and refrain from attempting to dismiss Pastor Bailey, threatening his arrest, spending money belonging to the church and denying access to the pastor and church members to the various keys, credit cards and other church financial and related records.

## Appellants Argue Religious Freedom and Jurisdiction

Appellants argue the courts lack subject matter jurisdiction to decide a case involving an ecclesiastical decision of a church board. I will first discuss sequentially every argument and authority cited by appellants. I will then address the two primary authorities of the majority. Thereafter, I will discuss the applicable law. The deacons first rely on the oft cited U.S. Supreme Court case of *Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 708–709, 724–725, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). They argue for the proposition that the constitution mandates separation of church and state and that the government is forbidden from interfering with hierarchal religious bodies' right to establish their own internal rules and regulations (and create tribunals for adjudicating disputes over religious matters). Appellants are quite correct that *Milivojevich* holds "civil courts are bound to accept the decision of the highest judicatories of a religious organization of hierarchical polity in matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Id.* at 713, 96 S.Ct. 2372. So too, disputes concerning structure, leadership

**4.** These facts are also directly reflected by the Church records.

or internal policies of a hierarchical religious institution are to be avoided. *Id.* at 709, 96 S.Ct. 2372.

At the onset, it should be noted that in a congregational church, the congregation itself is the highest authority. *Fort*, 54 S.W. at 896; *Libhart v. Copeland*, 949 S.W.2d 783, 793 (Tex.App.—Waco 1997, no writ). Thus, it is appellants who are themselves challenging the sovereignty of the Friendship Missionary Baptist Church. Further, appellants fail to articulate or appreciate some of the *Milivojevich* complexities.

*Milivojevich* dealt with the final resolution of a hierarchical church involving the episcopacy of a bishop and the creation of dioceses. *Milivojevich* stories a complex and multi-tiered ecclesiastical dispute. The Serbian Orthodox Church came into existence following a schism of the Universal Christian Church in 1054. *Milivojevich*, 426 U.S. at 699, 96 S.Ct. 2372. An American offshoot of the Russian Orthodox Church later transferred to the Serbian Church by agreement. Historically, as found by the supreme courts of both Illinois and the United States, the highest juridical, legislative and administrative authority of this Serbian Orthodox Church is the Holy Assembly of Bishops. *Id.* The highest executive body is the Holy Synod. *Id.* Only the Holy Synod and Holy Assembly could remove, suspend, defrock or appoint Diocesan Bishops. *Id.* Only the Holy Assembly could establish or reorganize the seat of a diocese. *Id.* at 699–700, 96 S.Ct. 2372. Bishop Dionisije Milivojevich was elected Bishop of the American–Canadian church's only diocese in 1939 by the Holy Assembly. Milivojevich, though controversial, helped grow the church, culminating in the creation of three new dioceses. Controversy finally caught up with Milivojevich who repudiated the division of the one older diocese into three new dioceses

(reducing his power) and flaunted first his suspension and later his removal as Bishop. *Id.* at 705–09, 96 S.Ct. 2372. Milivojevich was defrocked after refusing to answer his indictment. *Id.* at 706, 96 S.Ct. 2372. The Holy Assembly unanimously found the bishop guilty of all charges and divested him both of his episcopacy and his monastic rank. *Id.* It was Bishop Milivojevich who had already instigated protracted litigation against the Mother Church for alleged church constitutional violations and church penal code violation. *Id.*

It is little wonder than our highest Court would reverse the Illinois Supreme Court for probing "deeply enough into the allocation of power within a [hierarchal] church so as to decide ... religious law [governing church polity]." *Id.* at 709, 96 S.Ct. 2372. *Milivojevich* only affirms the 130–year–old *Watson* rule with respect to hierarchical churches:

> [T]he rule of action which should govern the civil courts ... is, that, whenever the question of discipline or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Watson v. Jones*, 80 U.S. (13 Wall) 679, 727, 20 L.Ed. 666 (1871). *Milivojevich* also cast serious doubt upon at least one of the supposed three exceptions allowing court inquiry into final hierarchal church decisions. *See Green v. United Pentecostal Church*, 899 S.W.2d 28, 31 (Tex.App.—Austin 1995, writ denied) (*Milivojevich* made clear there is no arbitrariness exception to the general rule courts must accept the decision of [highest] ecclesiastical tribunal).[5]

---

**5.** Marginal court review of ecclesiastical decisions produced by fraud, collusion or arbi-

The *Milivojevich* court also acknowledged in a footnote that "[no] claim is made that the 'formal title' doctrine by which church property disputes may be decided in civil courts is to be applied in this case." 426 U.S. at 723 n. 15, 96 S.Ct. 2372.

If *Milivojevich* is to apply literally, appellants would still face the trial court's enforcement of the highest ecclesiastical tribunal-the congregation of the Friendship Missionary Baptist Church. The church made the same order for return of the Church's property. In essence, the trial court did no more or less than enforcement of the congregations' resolution of the property dispute, precisely the outcome in *Milivojevich.*

Appellants also argue a Houston appellate case citing *Milivojevich.* In *Tran,* an excommunicated Catholic priest brought a defamation action against Bishop Fiorenza and the Catholic Diocese. *Tran v. Fiorenza,* 934 S.W.2d 740, 741 (Tex.App.—Houston [1st Dist.] 1996, no writ). The *Tran* court acknowledges that churches are as amenable as other societal entities to rules governing property rights, torts and criminal conduct. *Id.* at 743 (citing *Watson,* 80 U.S. (13 Wall) at 732–33). Because Tran's tort claims arose out of divestiture of priestly authority, they were inseparable from ecclesiastical functions, and further, the Bishop's duties required communication of Tran's excommunicated status. Thus, all was part of an ecclesiastical transaction. *Tran,* 934 S.W.2d at 744. Appellants do not point us to anything in the record that would make *Tran* applicable to this lock out situation.

Appellants correctly cite *Patterson v. Southwestern Baptist Theological Seminary,* 858 S.W.2d 602, 606 (Tex.App.—Fort Worth 1993, no writ), for the general proposition that congregational churches are treated like the hierarchal system in giving deference to the church authority deciding ecclesiastical determinations. In *Patterson,* a seminary professor was terminated after formal charges were brought against him including: lifestyle and behavior inconsistent with the example expected; poor example of churchmanship; intentionally distorting the truth in reporting; and not adequately responding to warnings. *Id.* at 604. Employment decisions were governed by criteria including being an active and faithful member of a Baptist Church plus subscription in writing to the Articles of Faith. *Id.* at 605. Thus the court concluded Patterson's employment was clearly one of ecclesiastical concern, unresolvable without reference to spiritual meaning and guidelines. *Id.* Here, the experienced trial court did not restrain proper church authority from pursuing any ecclesiastical course of action or election. The congregation was properly left free to hire and fire its pastor according to majority rule.

Appellants next argue the generality that courts should ordinarily defer church questions of discipline and government and limit exercise of jurisdiction to the determination of property rights, citing *Hughes v. Keeling,* 198 S.W.2d 779 (Tex.Civ.App.—Beaumont 1946, no writ).[6] In *Hughes,* the trial court refused to enter a temporary injunction requiring another election, de-

---

trariness is apparently first mentioned by dicta in *Gonzalez v. Archbishop,* 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929).

**6.** Appellants note *Hughes* reliance upon *Brown v. Clark,* 102 Tex. 323, 116 S.W. 360, 363 (Tex.1909) (questions of discipline or

faith or ecclesiastical rule decided by highest church judicatories are accepted as final). *Brown* also holds, however, that the court has jurisdiction to determine legal ownership of property after the union or merger of the two churches. *Id.* at 364.

positing rolls and records with the district clerk, inquiry into plaintiff's excommunication and restraint of appellees' use of church funds. However, only two witnesses testified and indicated this congregational church excised the appellants from the church by a recorded vote of 206 to 8. No testimony indicated money or financial records were improperly withheld. *Id.* at 783–84. No other property matter was shown in the record including any trespass. *Id.* Thus, the trial court correctly denied appellants' prayer. In interesting dicta, the *Hughes* court noted appellee Johnson was a deacon and director and thus had a right to enter the Church building and participate in Church meetings. *Id.* at 782. This is precisely the right the trial court protected in the temporary orders below; the duly elected Pastor was allowed entry to the Church. The three appellants were enjoined from threatening to have arrested or causing an arrest of Pastor Bailey merely because of his presence on Church grounds. Unlike *Hughes*, the trial court was faced with days of testimony outlining allegations of criminal trespass, threatened law enforcement action, exclusion of both the pastor and the church body, and confiscation or withholding of various church personalty. If anything, our appellants find themselves postured like the *Hughes* appellants; appellants were the minority and on the losing end of a valid and binding congregational church vote.

Finally, on the jurisdiction issue, appellants argue the trial court foolishly involved itself in the discharge of a minister, citing *Green*, 899 S.W.2d 28. Green was a Pentecostal pastor who lost his UPCI license for immoral and disruptive conduct. The Austin court held the UPCI's decision to terminate Green's license was purely ecclesiastical. *Id.* at 30. Civil courts will not review the subjective judgment of UPCI's governing body. *Id.* at 31. Once again appellants' argument and authority fail. The trial court here simply refused to allow a renegade minority to oust a pastor without authority, file frivolous criminal charges, and usurp the highest ecclesiastical authorities right to use their church, hold their books and elect whomever they wished as pastor. While appellants do not complain here about losing their positions as deacons, that is the precise action that would be proscribed by *Green*.

## The Majority Opinion's Authority

Virtually ignoring the authorities cited by appellants and appellees,[7] the majority essentially relies on the holdings in *Jones v. Wolf*, 443 U.S. 595, 602, 604, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), and *Williams v. Gleason*, 26 S.W.3d 54, 58–59 (Tex. App.—Houston [14th Dist.] 2000, pet. denied), *cert. denied*, 533 U.S. 902, 121 S.Ct. 2242, 150 L.Ed.2d 231 (2001). First, *Jones* never states the Georgia courts lacked jurisdiction. *Jones* has a complex history but suffice it to say, the Georgia Supreme Court was twice rebuffed for delving into the laws and regulations of the church, *i.e.*, the "Book of Church Order," in order to determine the "true congregation." *Jones*, 443 U.S. at 599–600, 99 S.Ct. 3020. In other words, it was the *manner* of the state court inquiry that *Jones* criticizes. The *Jones* court simply remanded the case again for yet another attempt at resolution-not a summary dismissal for want of jurisdiction as our majority opinion has done. In any event, *Jones* supports the trial court decision because it clearly and unequivocally states: "The State has an

---

**7.** Indeed, both appellants and appellees rely almost exclusively upon *Milivojevich* and its progeny.

obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively. *Presbyterian Church I* [*v. Hull Church*], 393 U.S. [440], at 445 [89 S.Ct. 601, 21 L.Ed.2d 658 (1969)]." *Id.* at 602, 99 S.Ct. 3020. The problem in *Jones* was Georgia's use of different rationales that required reference to religious doctrine or rules found in the Book of Church Order, rather than applying "neutral principles" *and* deference to the highest ecclesiastical tribunal as required by *Milivojevich. Id.* at 609, 99 S.Ct. 3020.

Aside from a cursory description of *Jones*, the majority clearly misses the Supreme Court's clear message to the states: if Georgia adopted a presumptive rule of majority representation (defeasible upon showing identity of the local church), this would be consistent with both the First Amendment and neutral-principles analysis. This is precisely Texas' approach to unincorporated associations and congregational churches. *Libhart v. Copeland,* 949 S.W.2d 783, 792 (Tex.App.—Waco 1997, no pet.) (see discussion *infra*). Unlike the Georgia approach, Texas has taken a pragmatic approach expressly approved in *Jones.* And the trial court intuitively and correctly followed *Jones* by both deferring to the highest ecclesiastical assembly and following the presumptive majority rule. Neither the trial court nor I find it necessary to address a single doctrinal issue to resolve this dispute. The majority opinion suggests that because there are no govern-

ing church documents the dispute can apparently only be resolved by delving into doctrine or polity. Actually, *Jones* is inapposite. *Jones* forbade the court from looking into the Book of Church Order. *Jones,* 443 U.S. at 599, 99 S.Ct. 3020. Yet because there were no books to delve into, the majority somehow divines that this factor argues against jurisdiction. Apparently the majority opinion also wishes to avoid the clear instruction of *Jones* concerning "majority rule" and the fact that this case can be determined by a simple review of the majority's decision in its minutes.[8] And finally the majority opinion ignores *Jones'* clear prescription for this case: *"The majority faction generally can be identified without resolving any question of religious doctrine or polity." Id.* at 607, 99 S.Ct. 3020.[9]

The majority opinion also relies upon our holding in *Gleason.* There, members of a church were disciplined by the church and sought damages from the church members who conducted their disciplinary trial and appeal. *Gleason,* 26 S.W.3d at 59. We merely held such claims would require us to review ecclesiastical judicial processes and determine religious beliefs and practices. *Id.* at 60. In the case *sub judice,* there is simply no inquiry into religious beliefs, ecclesiastical judicial processes or the like. The inquiry ended with the majority rule of this congregational church. *See Jones,* 443 U.S. at 607, 99 S.Ct. 3020.

And *Gleason* must also be read in conjunction with *Tilton* which is cited therein

---

8. A copy of the church minutes of the meetings of December 7, 1999 and December 14, 1999 are attached to the opinion as exhibits "A" and "B" respectively.

9. The majority opinion determines that "the authority of the deacons" is a factual, doctrinal dispute. This is not true. Ample authority in law, and in fact, support the trial court's

jurisdictional statement that this is a congregational church. Therefore, the majority of the church body is the final, sovereign authority of the church. The deacons were fired. That is final and unappealable. This is one, if not the quintessential, error of the majority opinion.

with approval. In *Tilton v. McClellan*, 925 S.W.2d 672 (Tex.1996), our supreme court refused to dismiss plaintiffs' claims of fraud and conspiracy as related to fraud. *Id.* at 675. "Although freedom to believe may be said to be absolute, freedom of conduct is not and conduct even under religious guise remains subject to regulation for the protection of society." *Id.* at 677 (applying Texas Constitution). The federal constitution similarly distinguishes between freedom to believe and freedom to act which remains subject to regulation for society's protection. *Id.* In our case, the dissident deacons obtained the vote of Deacon Jones by trickery, and sought to thwart the will of the majority by threats of criminal charges.

## First Amendment Rights and Property Rights

The intersection of property rights and religious freedom is not blessed with a bright line. However, appellants ignore a myriad of federal and state authorities that delineate civil court jurisdiction in matters involving civil, contract and property rights. The United States Supreme Court squarely held there is little doubt about the general authority of civil courts to resolve questions of which faction of a church is entitled to "possess and enjoy the property located at 2193 Vineville Avenue in Macon, Ga." *Jones*, 443 U.S. at 602, 99 S.Ct. 3020. "The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Id.* (citing *Presbyterian Church v. Hull Church*, 393 U.S. 440, 445, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969)).

An 1872 Supreme Court opinion addressed a situation almost identical to our facts. A minority of the Third Baptist Church in Washington, D.C., attempted to remove trustees elected by a majority and to exclude the majority from property where the church rightfully worshiped. *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 137–40, 21 L.Ed. 69 (1872). "An examination of the minute-book leaves no doubt in our minds that the election was made as claimed by the complainants, and that they were elected by a number of votes averaging more than two hundred." *Id.* at 138. The Court made it clear it was not addressing a question of membership or church discipline. *Id.* at 139. Rather, the Court dealt with property and took the fact of excommunication as conclusive proof the persons exscinded were not members. *Id.* at 139–40. However, the Court went on to hold "the action of the small minority ... by which old trustees were attempted to be removed, and by which a large number of the church members were attempted to be exscinded, was not the action of the church, and ... was wholly inoperative." *Id.* at 140. Further, in a congregational church, the majority represent the church. *Id.* "An expulsion of the majority by a minority is a void act." *Id.* The determination of the rightful trustees required the surrender of the church property and was correctly determined by the trial court. *Id.* at 138–39. Applied to our facts, the abortive attempt to takeover the church by appellants, was a void act.

In *Maryland & Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (per curiam), the United States Supreme Court again approved a state civil court delving into the ownership and control of church property. In a per curiam opinion, the high court approved the Maryland court's disposition of this property dispute because the resolution involved no inquiry into religious doctrine. *Id.* at 368, 90 S.Ct. 499. The concurrence noted the First Amendment commands civil courts to decide

church property disputes without resolving controversies over religious doctrine. *Id.* at 368, 90 S.Ct. 499 (Brennan, J., concurring, joined by Douglas, J., and Marshall, J.). A review of the record below shows no testimony concerning religious or doctrinal matters. This was not a doctrinal dispute. The only evidence remotely ecclesiastical dealt with the largely undisputed fact a congregational church is controlled by a majority vote and is sovereign, *intra se.*

It is also true, as the majority reiterates, that court review must meet the "neutral principles of law" standard specifying the courts should not delve into doctrinal matters. *Jones* at 604, 99 S.Ct. 3020.

### Applicable Texas Authorities

Texas law specifically authorizes that "[a]ny ... unincorporated association ... may sue ... in its ... assumed or common name for the purpose of enforcing ... a substantive right...." Tex.R. Civ. P. 28; *Libhart v. Copeland*, 949 S.W.2d 783, 792 (Tex.App.—Waco, 1997, no pet.). Applying neutral legal principles, a court may employ "the ordinary principles which govern voluntary associations." *Fort*, 54 S.W. at 896. A court should not act as referees for members of associations so long as such associations are fairly and honestly administered in conformity with law, and civil or property rights are not invaded. *Libhart*, 949 S.W.2d at 793. "Conversely, the proceedings of the association are subject to judicial review where there is fraud, oppression, or bad faith, or property or civil rights are invaded, or the proceedings in question are violative of the laws of the [association], or the law of the land, or are illegal." *Id.* (quoting *Fraser v. Buck*, 234

S.W. 679, 683 (Tex.Civ.App.—Galveston 1921, no writ)).

Here, there is no need to ponder the mysteries of religion. This dispute can be solely, and was in part resolved, by reference to two Church records. Specifically, the minutes of the congregation's meetings of December 7, 1999, and December 14, 1999, reflect the final authoritative decisions [10] of the church. This is simply not a question of doctrine but of majority governance and rights to their own church and church property.

While civil courts are prohibited by the First Amendment from exercising jurisdiction over purely ecclesiastical matters, they do have jurisdiction "as to civil, contract, and property rights even when they are involved in, or arise from, a church controversy." *Ex parte McClain*, 762 S.W.2d 238, 241 (Tex.App.—Beaumont 1988, no writ) (citing *Milivojevich, et al.*); *see also Gleason*, 26 S.W.3d at 59–60 (churches function within the civil community and are amenable to rules governing property rights, torts, and criminal conduct; however, church disciplinary action by elders is ecclesiastical). Very much to the point of the controversy, in *McClain*, the pastor refused to follow the vote of the majority in a congregational church. *McClain*, 762 S.W.2d at 241. (In our situation, the defrocked deacons refused to follow the vote of the majority.) McClain was held in contempt for violating a permanent injunction from interfering with the normal workings of the church, going on the property, and withdrawing or spending funds of the congregation (and ordering him to return the keys). *Id.* at 239. The court found the church pled a protectable civil or property right which

---

**10.** These were the final decisions as contemplated by case precedent. This is not to say the congregation could not change its mind at a subsequent meeting. Nor did the trial court prohibit any subsequent proceedings by the church including the election of a new pastor, removal of Pastor Bailey, reinstatement of the deacons, et cetera.

would give the court jurisdiction. *Id.* at 241–42.

Civil courts should not dismiss claims based on property rights. *Waters v. Hargest,* 593 S.W.2d 364, 365 (Tex.Civ. App.—Texarkana, 1979, no writ); *see also Mayhew v. Vanway,* 371 S.W.2d 90 (Tex.Civ.App.—Houston 1963, no writ). A contract right is a protectable property right which may be determined solely by the application of neutral principles. *Waters,* 593 S.W.2d at 365. Congregational churches are completely autonomous and governed by majority rule. *Id.* Without a hierarchical constitution or regulations governing a property (contract) right, there are accordingly no church adjudicatories with jurisdiction to determine contract rights. *Id.* at 365–66. Without adjudicatories, contract rights may be determined by the application of neutral principles of law. *Id.* If however, the rights cannot be determined by neutral principles of law, "we must defer to the majority vote of the congregation." *Libhart,* 949 S.W.2d at 793.

When a church division occurs within a hierarchical religious body, and a property dispute arises between rival groups, the question is simply one of identity. *Presbytery of the Covenant v. First Presbyterian Church of Paris, Inc.,* 552 S.W.2d 865, 871 (Tex.Civ.App.—Texarkana 1977, no writ). The court merely resolves the identity issue which in turn necessarily settles the property rights by applying neutral principles of law. *Id.* Contrariwise, these issues may not be the basis of a heresy trial to adjudicate the truth or falsity of religious doctrine or belief. *Green,* 899 S.W.2d at 30; *see also Presbyterian Church v. Blue Hull,* 393 U.S. at 450, 89 S.Ct. 601 (departure-from-doctrine approach is not susceptible of "marginal" judicial involvement).[11]

Finally, it is the trial court, and not the appellate court, that has the fact finding jurisdiction and power to determine "facts underlying the Court's jurisdiction." *Diocese of Galveston–Houston v. Stone,* 892 S.W.2d 169, 177 (Tex.App.—Houston [14th Dist.] 1994, no writ). Multiple jurisdictional facts were found by the trial court and remain unchallenged by appellants. These jurisdictional facts include: (1) the church membership is the governing body; (2) that appellants intend to take action to prevent the pastor from pastoring and exclude him from the church grounds; (3) that appellants threatened the arrest of the pastor for his presence on the church property; and (4) that appellants refused access by the pastor and church body to the physical assets, the church building and the church property. Accordingly, the court ordered a return to the status quo before the unlawful seizure by appellants. Appellants were required to return keys to the church, church vehicles, post office box, safety deposit box and return church gasoline credit cards, bank statements, checking accounts, checkbooks, financial and other records and the church vehicle(s) to the respective church officers. Appellants provide not a single cite to the reporter's record that supports their argument that the trial court exceeded its authority under the United States Constitution.

I would hold the district court had jurisdiction to determine property rights, especially when threatened breaches of the peace embroil local law enforcement authority. *Jones,* 443 U.S. at 602, 99 S.Ct. 3020; *Brown,* 116 S.W. at 364; *Tran,* 934 S.W.2d at 743; *McClain,* 762 S.W.2d at 241; *Waters,* 593 S.W.2d at 365; *see also Milivojevich,* 426 U.S. at 723 n. 15, 96

---

11. See footnote 5. Marginal court review is an exception to the general rule that courts must accept as final, the resolution of the highest ecclesiastic authority.

S.Ct. 2372. I would further hold the trial court appropriately deferred to the highest ecclesiastical authority of the Friendship Missionary Baptist Church—the congregation itself. *Milivojevich,* 426 U.S. at 713, 96 S.Ct. 2372; *Watson,* 80 U.S. (13 Wall) at 727; *Fort,* 54 S.W. at 896; *Jones* 443 U.S. at 609, 99 S.Ct. 3020. And, I would hold the trial court properly addressed property issues without delving into church doctrine. *Jones,* 443 U.S. at 607, 99 S.Ct. 3020; *see also Tilton,* 925 S.W.2d at 677–679. Appellants' first issue should be overruled.

### The Second Issue

In appellants' second issue, they seem to argue the temporary injunction is too broad and replaces one minister with another, declares one group the winner and grants all relief requested on the whole case, citing *Story v. Story,* 142 Tex. 212, 176 S.W.2d 925 (1944). Appellants once again do not cite to the record, do not complain about a specific part of the order, nor do they comply with TEX.R.APP. P. 52.(f),(g),(h), and (i). Nevertheless, it should be observed that *Story* stands for the general proposition that a temporary injunction will not issue when there is an adequate remedy at law. *Id.* at 927. While unnecessary to the resolution of the present case, *Story* also observes the purpose of a temporary injunction is to preserve the status quo and not grant complete relief as to the entire controversy. *Id.* at 928.

Appellate courts review the grant or denial of a temporary injunction by an abuse of discretion standard. *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993). The purpose of a temporary injunction is to preserve the status quo pending trial on the merits. *Id.* The "status quo" to be preserved by a temporary injunction is the "last, actual, peaceful, non-contested status which preceded the pending controversy." *Transp. Co. of Texas v. Robertson Transports, Inc.,* 152 Tex. 551, 261 S.W.2d 549, 553–554 (1953).

Here the trial court's order precisely identified and appropriately fashioned an order that clearly reflects the status quo before the disruptive and unauthorized actions of appellants. The order required the return of church property wrongful and recently appropriated by appellants. At the same time, the order did not prohibit the church from voting to change pastors, deacons, membership or otherwise attend to the temporal and spiritual journey of the Friendship Missionary Baptist Church. Accordingly, appellants' second issue should be overruled, and the temporary injunction order affirmed.

# EXHIBIT A

Friendship Missionary Baptist Church
911 Old Madisonville Road
P.O. Box 1298
Huntsville, Texas 77340-1298

PLAINTIFF'S
EXHIBIT
4

December 7, 1999

### Church Business Meeting

The church body met in regular session, to discuss and resolve emergency church matters. The church met in the facilities of Fidelity Lodge 221, located Martin Luther King Blvd., reason being deacons changed locks on church, the body unable to enter. The following Moderators were invited, to help resolve church problems: Moderator: Rev. Dr. L. R. Harrison (absent because of illness) 1st vice moderator: Rev. Willie Williams, 2nd Vice Moderator: Rev. Michael Davis (appointed to preside by Moderator Harrison), 3rd Vice Moderator: Rev. Waydell Maxey, Secretary for district: (Ballot counter) Rev. Pete Rucker.

The meeting was called to order approximately 7:25 P.M. by presiding 2nd Vice Moderator, Rev. Michael Davis, with Scripture: Rev. Pete Rucker(1Cor.14:40) Prayer: Rev. Willie Williams. Acting presiding Moderator, Rev. Michael Davis, opening statement to church body stating the purpose of the presence of the Moderators, were to serve as advisory counsel, to assist fellow churches when problems arrives, further stating it is proper to call upon the District Moderators in times like these. Acting Moderator, Michael Davis, asked church clerk if the church had a membership roster? clerk answered yes. He further enquired, whether the church body had adopted by-laws, body answered no. Moderator Michael Davis, then cited problem at hand which the body expressed great concern being: The deacons, unbeknowing the church body, fired Pastor Leroy Bailey Sr., as pastor of Friendship Missionary Baptist church, served him with a Resolution, served by the Walker Co. Sheriff department (decision by five Individuals known as deacons). Lastly, the locks on church was changed, thus locking body out of church. Moderator advised the church body since by laws were'nt adopted, the body would decide which voting decision would be adopted, the church voted unanimously to use voting procedure majority rules. Acting Moderator Davis, stated next order of business requested by the church body, to vote whether pulpit of the church should be declared vacant and what voting procedure would be used? the church body again voted that the secret ballot would be used. The church body voted on secret ballot. Ballots were counted by 3rd Vice Moderator, Rev. Waydell Maxey and Secretary of District, Rev. Pete Rucker. While votes were being counted Sis. Rosie Bowers, asked that the church body pray for God's will to be done. Rev. Michael Davis, offered strengthening words of prayer. The ballot counters reentered the room, passed information to acting Moderator, Michael Davis, he then announced that with majority decision of the body, Rev. L. J. Bailey Sr., would remain the Pastor of Friendship Baptist Church.

Deacon J. C. Jones, asked Moderator if he may address the body, permission granted. Deacon J. C. Jones, stated that he was the oldest deacon on the deacon board of Friendship, further stating that he was tricked into signing documents to declare the pulpit vacant, which was presented to him by the board of deacons, he stated that he thought he was signing insurance papers, not papers to run the Pastor off.

Deacon J. C. Jones further stated that he wanted to rescind his support of deacons on firing the Pastor.

Moderator Michael Davis, stated to the body in closing, that any further decisions on issues of deacons would be handled by the church, since Pastor L. J. Bailey, has been voted to remain as Pastor. Moderator Michael Davis, stated that church rules and biblical rules has been broken, but nothing is to hard for God. We don't want to ever embrass God. We are people with faults, let us pray that we stay in God's will and in his way. Further stating, that the church will need to obtain legal counseloring on which legal path to take to move forward and to abide by the law.

Sis. Iesua Minor, made motion for Sis. Onita Oliphant, church clerk, to act as legal liason, to obtain legal advice for the church, the motion was seconded by Rev. Clarence Griffin. The church body voted · unanimously, by show of hands that Sis. Onita Oliphant would act as legal liason, to obtain legal information for church body.

Encouraging words to the church was offered by 1st Vice Moderator, Rev. Willie Williams, encouraging the church to pray and draw close to God. 3rd Vice Moderator Rev. Waydell Maxey, admonishing the church to stick together and love one another. Secretary of District, Rev. Pete Riker, The church is many members but of one body. stick together and adopt some by laws.

Sis. Mary Baker, thanked the Moderator's staff of the Central District for coming to Friendship's rescue. The meeting was adjourned with prayer by 3rd Vice Moderator, Rev. Waydell Maxey.

Rev. Michael Davis, Acting Moderator Presiding

Advisory Counsel:
Rev. Willie Williams, 1st Vice Moderator
Rev. Waydell Maxey, 3rd Vice Moderator
Rev. Pete Riker, District Secretary
Clerks:
Sis. Onita Oliphant, Church Clerk
Sis. Iesua Minor, Assistant Clerk

Recorded this 7th day of December , 1999.

Onita J. Oliphant , Clerk

Friendship Missionary Baptist Church

Members Present

1. Rev. Clarence Griffin

2. Deacon J. C. Jones

3. Sis. Rosie Bowers

4. Bro. Norman Johnson

5. Bro. Tobe Oliphant, Sr.

6. Bro. Ronnie Carter

7. Bro. Morris Shaw

8. Sis. Onita Oliphant

9. Sis. Iesia Minor

10. Sis. Deloris Griffin

11. Sis. Betty Johnson

12. Sis. Algeria Johnson

13. Sis. Doris Burnett

14. Sis. Geneva Johnson

15. Sis. Bernoice Washington

16. Sis. Gwen Grigsby

17. Sis. Gloria Ross

18. Sis. Sandra Wallace

19. Sis. Jewel Jones

20. Sis. Sonja Archie

21. Sis. Patricia Brown

22. Sis. Patsy Dewalt

23. Sis. Luevenia Johnson

24. Sis. Leslie Johnson

25. Sis. Donna Watkins

26. Sis. Mary Baker

# EXHIBIT B

Friendship Missionary Baptist Church
911 Old Madisonville Road
Huntsville, Texas 77340-1288

Church Business Meeting
12/14/99

The Church body met in emergency session, December 7, 1999, to discuss Church business. The Church met in the facilities of Fidelity Lodge 221, located on Martin Luther King Blvd. The reason that the body had to meet in this facility was because the deacons changed the locks on the Church. The Church body has been unable to enter the sanctuary since December 1, 1999.

The meeting was called to order at approximately 7:45 P.M., with Pastor L. J. Bailey presiding. Devotion was offered, with song Jesus Keep me Near thy Cross. The scripture was 1 Corinthians 6:1-8. A prayer of consecration was offered by Rev. Clarence Griffin an associate minister of Friendship. Presiding officer L. J. Bailey reviewed the agenda. The major item was to give the deacons an opportunity to respond to a second request from pastor and Church body. The presence of the following deacons was requested:

Milford Hawkins - Deacon Chair
Henry Smith - Co-Chair
Robert McGowan - Member
Levall Davis - Member
J. C. Jones - Member

A letter was hand delivered to each of the abovementioned persons. The following actions were taken by these deacons without authorization of the Church body:

Attempted to terminate the services of L. J. Bailey as Pastor.
Changing the locks on Church thusly prohibiting the body access to the Church without notification of Church council and members.

The five abovementioned deacons presence was requested at the meeting. Deacon J. C. Jones was the only deacon present at the meeting. Deacon Jones was present at both meetings. None of the other persons responded either in person or written correspondence.

Deacon J. C. Jones, asked permission to address the body as he had done on December 7, 1999. He asked the church body to forgive him for his former actions against Pastor Bailey and the Church. Brother Ronnie Carter, obtained permission to speak. In his statement he said that Deacon Jones was the only deacon to respond and acknowledge the church bodies request, by showing remorse and coming before the Church and to ask for forgiveness for his mistakes. He made a motion that Deacon Jones be forgiven and restored as a deacon. It was unanimously agreed upon by the body.

PLAINTIFF'S
EXHIBIT
6

## Page 2

The Church body agreed to vote on the status of each deacon. Based on the number of members present it was decided that the secret ballot method would be used and the majority would prevail. Each person was handled individually.

1. Should Deacon Henry Smith be terminated as a Co-chair of deacons and removed from trustee board?
 Church voted: yes

2. Should Deacon Milford Hawkins, be terminated as Deacon Chair?
 Church voted: yes

3. Should Deacon Robert McGowan be terminated as a member of the Deacon board?
 Church voted: yes

4. Should Deacon J. C. Jones, be terminated as a member of the Deacon board?
 Church voted: no

5. Should Deacon Levall Davis, be terminated as a member of the Deacon board?
 Church voted: yes

Upon termination of the abovementioned deacons all keys to church vehicles, post office box, safety deposit box, Church gas cards and all financial bank statements including the check book should be returned. All names on the signature card at all financial institutions will be revoked. It is further requested that all records pertaining to the Church must be relinquished immediately. The body agreed that Assistant Clerk Iesia Minor be the recipient of the confiscated items. A motion was made by Sister Sonja Archie and seconded by Rev. Clarence Griffin to add Sister Onita Oliphant to the board of trustees. The motion carried. (The motion was a unanimous decision). Rev. C. W. Griffin, stated that the Church body has spoken, the Church is her own sovereign power admonishing everyone to govern themselves prayerfully.

The meeting was adjourned with closing remarks and a prayer by presiding officer, Rev. L. J. Bailey.

Rev. L. J. Bailey,　　　Pastor and Presiding Officer.
Sister Iesia Minor,　　　Assistant Clerk
Sister Onita Oliphant,　Church Clerk

Minutes recorded this _11th_ day of December, 1999.

_Onita J. Oliphant_
Onita J. Oliphant, Church Clerk

Members Present
for
Business Meeting

1. J. C. Jones
2. C. W. Griffin, Rev.
3. Tobe Oliphant, I
4. Yvonne Bailey
5. Sonja, Archie
6. Luevenia Johnson
7. Edwina Edmond
8. Doris Burnett
9. Lenora Shaw
10. Gwen Grigsby
11. Donna Watkins
12. Jewel Jones
13. Geneva Johnson
14. Algeria Johnson
15. Morris Shaw
16. Onita Oliphant
17. Iesia Minor
18. Ronnie Carter
19. Gloria Ross
20. Margaret Taylor
21. Sandra Wallace
22. Berneice Washington
23. George Oliver
24. Nate Grigaby