PRESENT: Powell, C.J., Kelsey, Chafin, Russell, and Mann, JJ., and Millette and Mims, S.JJ.

SHALOM PRESBYTERIAN CHURCH
OF WASHINGTON, INC., ET AL.

OPINION BY
v.  Record No. 250303                          JUSTICE WESLEY G. RUSSELL, JR.
JUNE 4, 2026

ATLANTIC KOREAN AMERICAN PRESBYTERY


FROM THE COURT OF APPEALS OF VIRGINIA

    Shalom Presbyterian Church of Washington, Inc. ("Shalom") and Pastor Bo Chang Seo

("Pastor Seo") appeal a decision of the Court of Appeals reversing the grant of summary

judgment that the circuit court rendered in their favor in a dispute with the Atlantic Korean

American Presbytery over the relationship between the parties and the effect of that relationship

on the ownership of certain property.  Although we conclude that the circuit court erred in

granting summary judgment to Shalom and Pastor Seo, we also conclude that the Court of

Appeals erred in its reasoning and ultimate disposition of the case.  Accordingly, for the reasons

that follow, we reverse the judgment of the Court of Appeals and remand the case to the Court of

Appeals with instructions to remand the matter to the circuit court for further proceedings

consistent with this opinion.

I.  BACKGROUND[1]

---

[1] In the circuit court, the case was resolved on cross-motions for summary judgment.  The motions were heard in the circuit court pursuant to what has been characterized as the parties' Rule 56 agreement, a reference to Rule 56 of the Federal Rules of Civil Procedure.  Under the agreement, the circuit court was allowed to consider for summary judgment purposes any evidence, such as affidavits and deposition testimony, that a federal court could consider when ruling on a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Although the agreement of the parties expanded what the circuit court could consider in resolving the motions for summary judgment, it did not alter the relevant Virginia standard for awarding summary judgment—that what is properly before the court demonstrates "that the

Founded in 1982, Shalom[2] was created as an unincorporated house of worship catering primarily to Korean-speaking congregants. Shalom initially was presbyterian in name, not denomination; retaining its character as an "independent and non-denominational" congregation and using "presbyterian" colloquially, as many Korean Christians do. Shalom first used a rental facility in Fairfax for services, though it, through its trustees, owned a 25-acre parcel of land in Stafford, Virginia that it hoped to develop into a church site. In 1988, Pastor Seo graduated from seminary school and promptly joined Shalom as its head pastor. He has held that position ever since.

In 1998, Pastor Seo and Shalom were approached by members of the nascent Atlantic Korean American Presbytery ("AKAP") and invited to join its membership of Korean-speaking churches. According to Pastor Seo and Shalom, the "articulated purpose of AKAP's outreach to [Shalom] was so it could reach the membership quota so as to be a qualified presbytery of the [Presbyterian Church (U.S.A.)]."

The Presbyterian Church (U.S.A.) ("PCUSA") is a hierarchical church "subject to control by a super-congregational body" with its own binding rules. That hierarchy is made up of successive and increasing levels of governance, with individual congregations at the foundation. Congregations are governed by "sessions" composed of "persons elected by the congregation to active service as ruling elders, together with all installed pastors and associate pastors." These sessions have the responsibility of governing the congregation and "guiding its witness to the sovereign activity of God in the world[.]" Next are "presbyteries," governing bodies that have

---

moving party is entitled to judgment" and that there are no issues of "material fact . . . genuinely in dispute." Rule 3:20.

[2] Shalom was initially known as "Peniel Presbyterian Church," but changed its name shortly after Pastor Seo's ministerial tenure began in 1988.

jurisdiction over all sessions within a district, their congregations, and their ministers. Presbyteries are grouped together and overseen by one of sixteen "synods," intermediate councils covering specific geographic regions and including at least three presbyteries. Relevant here, the Synod of the Mid-Atlantic oversees AKAP, along with thirteen sister presbyteries. Finally, PCUSA's General Assembly sits atop this superstructure, serving as the "council of the whole church and it is representative of the unity of the synods, presbyteries, sessions, and congregations" of the denomination. That hierarchical structure, along with the other rules of PCUSA governance, are found in the Book of Order, which Pastor Seo acknowledges is the "law" of PCUSA and wherefrom AKAP draws its "power of authority[.]"

Seeking to aid AKAP in its quest to become a PCUSA presbytery, Shalom and Pastor Seo agreed to join AKAP in a short letter that said, "The following decision has been reached by our congregation:" with an "X" marked by the statement, "We join and support the Korean-American Presbytery." There was no separate application to join PCUSA. Shalom's application was accepted, and the Synod of the Mid-Atlantic chartered AKAP as a PCUSA presbytery in March 1998. As relayed in the synod's committee report chartering AKAP, "both (PCUSA) and non-PC(USA)" congregations "within the bounds of the Synod were invited to join the new presbytery[.]" Shalom and Pastor Seo were categorized as "NON-PRESBYTERIAN CHURCH (USA)" charter members, along with seven other churches. In an affidavit prepared for this case, Pastor Seo asserts that the designation of "NON-PRESBYTERIAN CHURCH (USA)" accurately reflected Shalom's status as an independent church, and Shalom "did not join PCUSA as part of that ceremony." Yet Pastor Jun Sook Kim ("Pastor Kim"), a "Stated Clerk" with AKAP and former assistant pastor at Shalom (albeit one who joined the church well after its affiliation with AKAP began) contends in her affidavit that the "NON-PRESBYTERIAN

3

CHURCH (USA)" designation "relates to the affiliation of Shalom Church *before* it joined AKAP and PC(USA)." (Emphasis added.) She further asserts, "[a]t the moment that the eight 'non-PC(USA)' churches joined AKAP, they likewise each joined PC(USA)."

Over the next two decades, Pastor Seo and Shalom's involvement with AKAP manifested in various ways. Between May 1998 and November 2021, Pastor Seo or another Shalom representative attended at least eighteen of AKAP's regular meetings, and Pastor Seo served as a secretary or moderator in several of those meetings. He also occasionally served on the nominating committee and was appointed as an "administrative commissioner[]" for the ordination service of another church's pastor. On at least one occasion, he requested an excused absence from an AKAP meeting. On another, the meeting agenda included an item addressing the "serving terms for the elders in Washington Shalom Presbyterian Church." At various points during the twenty-plus year affiliation with AKAP, Shalom paid annual dues to the presbytery; filled out annual statistical reports sharing details regarding total membership, capital building funds, local expenditures, etc.; sent money to AKAP to support other congregations; and participated in the AKAP pension plan.

Notably, the annual statistical reports Shalom filled out for AKAP were titled, in boldface type and all capital letters, "SESSION ANNUAL STATISTICAL REPORT PRESBYTERIAN CHURCH U.S.A." (2019, 2020, and 2021 "Church Statistical Report" for Shalom with the PCUSA logo in the top, right-hand corner) Pastor Seo testified during his deposition that he would not have shared this information with "entities other than AKAP or PCUSA[.]" Documents spanning a period of over twenty years also reference PCUSA or otherwise indicate that Shalom held itself out as a member of the denomination. For example, a 1998 AKAP questionnaire filled out by Pastor Seo features the PCUSA name and logo in the top-left corner.

4

A church bulletin from May 2019 said Shalom "is a church affiliated with the Atlantic Korean American Presbytery PCUSA." Similarly, a 2022 church history sheet prepared by Shalom and published to its own members reflects that Shalom joined AKAP in 1998 and designates the presbytery as belonging to PCUSA.

Shalom also appears to have retained some benefit vis-à-vis PCUSA. In August 2015, Shalom received a letter from PCUSA stating that it had "verified through the records of the Presbyterian Church (U.S.A.)" that "Shalom Presbyterian Church . . . is in good standing and is entitled to the Federal tax exemption granted to the Presbyterian Church (U.S.A.)[.]" The record also reflects that Pastor Seo petitioned AKAP for the ordination of Pastor Sungtak Chun in 2022, was approved, and carried out said ordination at Shalom.[3] The document signed by Pastor Seo to memorialize the event bore the name and logo of PCUSA at the top, as did the plaque Pastor Chun received congratulating him on his ordination.

Despite the foregoing, AKAP's (and PCUSA's) involvement with Shalom was "limited" in other respects. Shalom used its own signs and logos; supported itself financially; handled its own employment issues;[4] paid for all costs relating to the upkeep of its church property;[5]

---

[3] Pastor Seo addressed this situation in one of his affidavits, writing that Pastor Chun had been a practicing minister at Shalom for nearly a decade before the ordination ceremony in 2022. At that time, Pastor Chung completed an examination to be ordained by PCUSA and requested that the ceremony occur at Shalom, prompting the church's request to AKAP. "That ceremony had no effect on his employment at Shalom Church[.]"

[4] According to the deposition of David Kysug Kang ("Kang"), a corporate designee of AKAP, member churches have the freedom to hire their own clergy but must report to AKAP prior to the hiring decision. That said, "each church has different scenarios, situations, and AKAP cannot oversee all of it[,]" so unless the church "voluntarily report[s,]" AKAP does not "get involved any further."

[5] Chi Hyeon Yun ("Yun"), chairperson of AKAP's committee of the ministry, shared that "generally, each [member] church has to maintain its own property. But if [a] church is in a difficult situation, then [the] presbytery can decide to help out financially or not."

governed itself without AKAP input; and supervised an on-site daycare facility without AKAP involvement. Scaling further up the hierarchical ladder, "Shalom Church had no connection with the PCUSA and did not pay dues towards or receive visitors from that organization." Perhaps most relevant here, Shalom "[m]a[de] major financial decisions, such as buying property and/or taking out construction loans without input from (or notice to) AKAP[.]"

Shalom's trustees sold the 25-acre Stafford property in 1999 and used the proceeds, along with a bank loan, to purchase a property at 10505 New Road, Fairfax Station, Virginia 22039 ("the Property") in 2000. According to Pastor Seo, he did not "formally" mention the purchase to AKAP, but "some people [at AKAP] knew about it prior to the purchase." Throughout this process, "neither AKAP nor PCUSA mentioned that they had an ownership interest in the real property—they never contributed any funds nor accepted any financial responsibility for the loans or liabilities." In the years that followed, Shalom's trustees refinanced the Property, took out a construction loan to build a new church, secured a credit line as security for a loan, and incorporated Shalom to facilitate the transfer of property from themselves to the church. At no point in any of these processes did Shalom seek AKAP or PCUSA funds, indicate that those entities had an ownership interest in the Property, or seek their approval before buying or conveying the Property. Shalom went on to secure further credit lines and refinance loans to assist with ongoing church operations. Shalom is the sole title holder of the Property and obligor of debt—neither AKAP nor PCUSA are mentioned in any deeds, petitions, judicial orders, or bank documents dealing with the Property.[6]

---

[6] As detailed in Yun's deposition, however, "[t]here isn't any [] property under AKAP's name, but there is this trust relationship between churches." When asked whose name would generally be on the title for member church's property, Yun responded, "[i]t could be the presbytery, it could be the church itself." Yun went on to say, "So any church that is [a] member

In February 2022, Shalom entered into a $1.5 million refinancing loan agreement to secure a more advantageous interest rate, and the Deed of Trust encumbering the Property for that amount was recorded in Fairfax County. As part of its application for the loan, Shalom provided the bank the "Standing Rule[s] of Shalom Presbyterian Church of Washington[,]" which state that "[a]s a member church of Presbyterian Church in United States of America, we, The Shalom Presbyterian Church shall be subject to observe the Book of Order in its government and structure."[7] Pastor Kim, who held positions with both Shalom and AKAP at the time, informed Pastor Seo that "[a]ccording to the [B]ook of [O]rder, when you are refinancing, you need to get a written permission from the Presbytery through the session." To wit, § G-4.0203 of the Book of Order states that:

> All property held by or for a congregation, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a congregation or of a higher council or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.).

Once church property is acquired, § G-4.0206 provides that:

> A congregation shall not sell, mortgage, or otherwise encumber any of its real property and it shall not acquire real property subject to an encumbrance or condition without the written permission of the presbytery transmitted through the session of the congregation.[8]

---

of PCUSA, whether it's an independent church or however it is, they're in a trust . . . they have to be held in trust."

[7] Portions of the document are in English and portions of the document are in Korean. The quoted language is taken from the English language portion of the document.

[8] This language is drawn from the 2019-23 Book of Order. The record also includes excerpts from the 1998-99 Book of Order, the edition in effect at the time Shalom and Pastor Seo joined AKAP. The relevant provisions from that edition, § G-8.0200 ("All Property Held in Trust") and § G-8.0500 ("Selling, Encumbering, or Leasing Church Property") are substantially

Pastor Seo told Pastor Kim that he did not believe that the language from the Book of Order posed a problem, but his handling of the refinancing situation lead Pastor Kim to "wonder[] what Pastor Seo's background was." After doing some digging, she unearthed potential inconsistencies regarding his 1988 ordination and reported both the ordination and refinancing issues to AKAP.

AKAP contacted Pastor Seo in April to inform him it believed his ordination was invalid and that he had to be replaced. It also raised the issue of the 2022 refinancing violating the Book of Order. In November, AKAP, through Pastor Kim, sent a letter to Pastor Seo and Shalom announcing the creation of an "Administrative Commission" to replace Shalom's session and conduct "an overall audit of church finance . . . [and] legal registration status of church properties and to take actions as deemed necessary[.]" The Commission would also "evaluate whether to permit [Pastor Seo] to continue his ministry, and, if it is determined as necessary after evaluation, to dissolve [the] pastoral relationship between [Pastor Seo] and [Shalom] by due process[.]"

Shalom and Pastor Seo filed a complaint and request for stay of enforcement with the Synod of the Mid-Atlantic ("Synod Complaint").[9] The Synod Complaint asserted that Shalom

_____

similar to those reproduced above. *See also Atl. Korean Am. Presbytery v. Shalom Presbyterian Church of Wash., Inc.*, 84 Va. App. 1, 9 n.5 (2025) (noting that "[t]he parties requested that the circuit court take judicial notice of" excerpts of the 1998-99 Book of Order, and "the rules listed between these copies of the Book of Order are substantially the same").

[9] There is some question as to whether Shalom was a party to the Synod Complaint. The Synod Complaint was signed by counsel for Shalom, Pastor Seo "in his individual capacity as the Head Pastor" of Shalom, Pastor Seo "on behalf of" Shalom, and Chang Bae-Lee, in his capacity as the "Clerk of Session" for Shalom. Apparently, in disposing of the Synod Complaint, the Synod held that it did not appear that either Pastor Seo or Bae-Lee had "authority to file a request on behalf of the Shalom Presbyterian Church or its Session because the complaint does not allege that the Session has voted to authorize the complaint."

and Pastor Seo had standing—and the synod had jurisdiction—pursuant to the Book of Order. It further asserted that "[a]t all relevant times, Shalom Church has been and continues to be affiliated with the PCUSA." While "neither Shalom Church nor Pastor Seo has had much involvement or interactions with the AKAP" since joining the presbytery in 1998, "[a]t all times, Pastor Seo has believed in good faith that he and Shalom Church have been members in good standing of the AKAP and PCUSA." Pastor Seo also insisted he never sought to "mislead" either entity about his ordination, and AKAP's lack of involvement with Shalom's day-to-day affairs meant it "never crossed Pastor Seo's mind to obtain . . . authorization" when it came time to refinance the loan earlier that year. As a result, Pastor Seo "could not have reasonably believed" he was violating the Book of Order.

The Mid-Atlantic Synod denied the relief sought. The denial was without prejudice to the complainants' ability to amend the complaint or otherwise renew the request. Rather than doing so, however, Shalom "declare[d] itself independent from [AKAP] or any parent organization relating thereto" and subsequently filed suit in Fairfax County Circuit Court seeking (1) declaratory judgment that Shalom was no longer a member of AKAP and had sole control over its own assets, and (2) injunctive relief prohibiting AKAP from exercising any control over Shalom or its assets. In its answer, AKAP raised the affirmative defense that the complaint should be dismissed because it seeks to have the circuit court "determine ecclesiastical questions" in violation of both the U.S. and Virginia constitutions. AKAP also filed a counterclaim seeking, *inter alia*, a declaratory judgment that Shalom was a member of AKAP and PCUSA. The circuit court had granted a temporary stay while the matter was pending.

AKAP, Shalom, and Pastor Seo then filed cross-motions for summary judgment. AKAP argued that PCUSA holds the Property in express trust pursuant to the Book of Order because

9

Shalom purchased the Property after joining AKAP. Alternatively, Shalom's decision to join PCUSA and the "course of dealing" between the parties requires the conclusion that the Property is held in a constructive trust. On the other hand, Shalom and Pastor Seo argued that Shalom's relationship with AKAP and PCUSA was not hierarchical, and, even if it were, AKAP had slept on its rights and was estopped in law and equity from taking ownership of the Property.

At an October 2023 hearing on the motions, Shalom also asserted there was no express trust because it was not a PCUSA member under the requirements of the Book of Order. More specifically, § G-7.0201 of the 1998-99 Book of Order states:

> In organizing a particular church, [a] presbytery . . . shall receive applications for membership in the church . . . from persons wishing to unite in forming a new congregation. These persons shall covenant together as follows:
>
> We, the undersigned, in response to the grace of God, desire to be constituted and organized as a church to be known as _____. We promise and covenant to live together in unity and to work together in ministry as disciples of Jesus Christ, bound to him and to one another as a part of the body of Christ in this place according to the principles of faith, mission, and order of the Presbyterian Church (U.S.A.).
>
> (Signatures)

According to Pastor Seo, Shalom "did not do that[,]" and, although not conceding that no such covenant had been made, AKAP conceded that "[w]e do not have a signed covenant." It argued, however, that the course of dealing shows Pastor Seo joined AKAP, which is clearly under the umbrella of PCUSA.

The circuit court ruled that there was no express trust with PCUSA as the beneficiary because "the Book of Order sets out a process for application to be a congregation within the PCUSA, and it's an undisputed fact that there is no such application extant. . . . Therefore, [Shalom] cannot be a member of the PCUSA." Neither could it find a constructive trust because

10

"there is no course of dealing which suggests that there was an intent to create a trust." The circuit court granted summary judgment to Shalom and Pastor Seo, denied AKAP's motion for the same, and issued a final written order memorializing those rulings.

AKAP appealed. After a lengthy treatment of the historical and traditional practice of English and American courts of law addressing ecclesiastical questions, the Court of Appeals found that the circuit court lacked jurisdiction to hear Shalom and Pastor Seo's claim under the ecclesiastical abstention doctrine. The Court of Appeals based its conclusion on its understanding that Shalom and Pastor Seo's initial recourse was to file the Synod Complaint with the Mid-Atlantic Synod, which rendered a decision. *Atl. Korean Am. Presbytery v. Shalom Presbyterian Church of Wash., Inc.*, 84 Va. App. 1, 45-48 (2025). "Since neither Shalom nor AKAP contends that the PCUSA's Synod's decision was infected by either collusion or fraud, by granting Shalom's request for a declaratory judgment stating it was not a member, the circuit court's decision constitutes an . . . attempt to impermissibly substitute its own inquiry into church polity and resolutions[.]" *Id.* at 47 (internal quotation marks, brackets, and citations omitted). The Court of Appeals also found that Shalom's civil complaint "effectively collaterally attacked the Synod's decision (instead of appealing it) and entirely reversed the position it took on its PCUSA membership status before the ecclesiastical tribunal." *Id.* As a result, the Court of Appeals reversed the judgment of the circuit court, instructing the circuit court "to vacate its order and dismiss Shalom's current complaint." *Id.* at 50.

Shalom and Pastor Seo now appeal from that judgment.

11

## II. ANALYSIS

### A. Standard of review

When reviewing a circuit court's decision to grant or deny a motion for summary judgment, an appellate court conducts a *de novo* review. *GEICO Advantage Ins. Co. v. Miles*, 301 Va. 448, 455 (2022) (citing *VACORP v. Young*, 298 Va. 490, 494 (2020)). Whether the religion clauses of the United States Constitution preclude a circuit court from resolving a particular church property dispute raises a question of the circuit court's jurisdiction. *See generally Pure Presbyterian Church of Wash. v. Grace of God Presbyterian Church*, 296 Va. 42, 49-54 (2018). As a result, the determination of whether a circuit court may hear such a dispute poses a question of law subject to *de novo* review on appeal. *Ashland, LLC v. Va.-Am. Water Co.*, 301 Va. 362, 368 (2022).

### B. Summary judgment and a dispute of material fact

The circuit court entered summary judgment on behalf of Shalom, concluding that Shalom was not a member of PCUSA, and therefore, there was no obligation for Shalom to hold the Property in trust for PCUSA. Because, based on the materials before it, a genuine dispute of material fact existed as to Shalom's membership in PCUSA, the circuit court erred in granting Shalom's motion for summary judgment.

Summary judgment in Virginia is governed by Rule 3:20. In pertinent part, Rule 3:20 provides that summary judgment is appropriate when there are no issues of "material fact . . . genuinely in dispute" and the evidentiary materials before the circuit court demonstrate "that the moving party is entitled to judgment" as a matter of law. Although the parties in this case, through their Rule 56 agreement, expanded the materials the circuit court could consider at the

12

summary judgment stage, their agreement did not change this standard for awarding summary judgment.[10]

In determining whether a fact is in dispute, a circuit court may not weigh the evidence before it. *Piland Corp. v. League Constr. Co.*, 238 Va. 187, 189 (1989). Rather, a circuit court is limited to determining whether there is a genuine issue of material fact in dispute. In doing so, a circuit court must "accept[] as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason." *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009). If, when viewed in this light, "the evidence is conflicting on a material point or if reasonable persons may draw different conclusions from the evidence, summary judgment is not appropriate."[11] *Id.*

Whether or not Shalom is or was a member church of PCUSA is unquestionably a material fact in this case. Absent such membership, there is no viable argument that Shalom held the Property in trust for PCUSA or that it needed the permission of AKAP regarding any refinancing or other transactions related to the Property. Conversely, although Shalom contends it is not dispositive, if Shalom were a member of PCUSA, that fact unquestionably would have significance in determining whether the Property was held in trust for PCUSA, as member churches apparently are required to do.

---

[10] We note that, under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

[11] As we recently explained, this inability to weigh the evidence and resolve disputed factual issues distinguishes a motion for summary judgment from a plea in bar where evidence is taken. *See Stevens v. Jurnigan*, 305 Va. ___, 2026 Va. LEXIS 25, at *6 (Apr. 9, 2026) ("Unlike a motion for summary judgment, a plea in bar may require the resolution of disputed factual issues.").

Reviewing the material properly before the circuit court on the cross-motions for summary judgment, we must conclude that the issue of whether or not Shalom was a member church of PCUSA was in dispute. In fact, a review of the proceedings in the circuit court reveals that, in that forum, that question was front and center to the parties' argument.

The circuit court found that Shalom never entered into a covenant expressing its intention to join PCUSA and that such a covenant was an essential requirement for membership. This and other evidence, such as statements from Pastor Seo, led the circuit court to conclude that Shalom was never a member church of PCUSA. Certainly, there was sufficient evidence before the circuit court, if credited, to support such a conclusion.[12]

Of course, because the matter was decided on summary judgment, the issue before the circuit court, and ultimately the appellate courts, was not whether there was sufficient evidence for the circuit court to conclude that Shalom was never a member church of PCUSA. Rather, the issue was whether there was any evidence that conflicted with that conclusion to the point that there was a genuine dispute as to Shalom's membership status.

There certainly was evidence before the circuit court from which a rational factfinder could conclude that Shalom either was or had been a member church of PCUSA. Evidence demonstrated that Shalom joined AKAP, a presbytery within PCUSA, giving rise to at least an inference that Shalom was a member church of PCUSA. In contrast to Pastor Seo's disavowals of PCUSA membership, Pastor Kim offered sworn statements that Shalom was a member of PCUSA. Furthermore, in multiple documents it prepared or otherwise filled out, Shalom

---

[12] During this appeal, AKAP has asserted that Shalom conceded in its complaint in circuit court that it was a member of AKAP, and therefore, was bound by that representation. In the verified complaint, Shalom acknowledges that it was a member of AKAP, but never alleges that it was a member of PCUSA or subject to the Book of Order regarding property transfers or refinancings. To the contrary, fairly read, the complaint contests those conclusions.

indicated that it was a member church of PCUSA.  Notably, as part of its application for a loan refinancing the Property, Shalom provided the bank with the "Standing Rule[s] of Shalom Presbyterian Church of Washington[,]" which state that "[a]s a member church of Presbyterian Church in [the] United States of America, we, The Shalom Presbyterian Church[,] shall be subject to observe the Book of Order in its government and structure."

The conflicting evidence on the question of membership is perhaps best exemplified by the parties' disagreement over the significance of the synod's committee report chartering AKAP, in which Shalom was categorized as a "NON-PRESBYTERIAN CHURCH (USA)" charter member, along with seven other churches.  Pastor Seo asserts that the designation of "NON-PRESBYTERIAN CHURCH (USA)" accurately reflected Shalom's status as an independent church, and Shalom "did not join PCUSA as part of that ceremony."  Yet Pastor Kim asserts that the "NON-PRESBYTERIAN CHURCH (USA)" designation "relates to the affiliation of Shalom Church before it joined AKAP and PC(USA)[,]" and that, "[a]t the moment that the eight 'non-PC(USA)' churches joined AKAP, they likewise each joined PC(USA)."

These conflicting interpretations are simultaneously plausible and irreconcilable.  As such, they raise a classical factual dispute that requires a factfinder to resolve.  Because "the evidence is conflicting on a material point [and] reasonable persons may draw different conclusions from the evidence, summary judgment [wa]s not appropriate." *Fultz*, 278 Va. at 88. Accordingly, the Court of Appeals correctly found that the circuit court erred in awarding summary judgment to Shalom.  It does not necessarily follow, however, that the Court of Appeals correctly determined that the circuit court lacked jurisdiction to even entertain the dispute between the parties.

C.  Ecclesiastical abstention and neutral principles of law

When churches are involved in property or other disputes with internal factions or putative members, courts must tread lightly lest they intrude on the religious freedoms guaranteed by the First Amendment.  The fact that civil courts must tread lightly does not mean that they have no role in resolving such disputes; rather, they must do so applying secular legal principles without becoming entangled in matters of internal church governance or matters of religious faith.  *See Pure Presbyterian*, 296 Va. at 51-54.

The Court of Appeals recognized this principle, correctly observing that "circuit courts may utilize the 'neutral-principles' approach to address church property disputes in matters where religious entities contest secular matters," but may not "use 'neutral principles' in a manner which permits civil courts to invade purely ecclesiastical jurisdiction." *Atl. Korean Am. Presbytery*, 84 Va. App. at 50.  From this statement of general principle, the Court of Appeals ultimately concluded that, under the facts as it understood them, determining whether or not Shalom was a member of PCUSA involved an ecclesiastical question that the circuit court lacked jurisdiction to resolve.  *Id*.  The question before us is whether it was appropriate for the Court of Appeals to reach such a conclusion on this record at the summary judgment stage given the restrictions on factfinding such a posture imposes on courts.  For the reasons that follow, we conclude that it was not.

The classic case of civil courts being unable to resolve questions of church membership because doing so would invade ecclesiastical prerogatives involves the situation where competing groups claim to be the "true" church or congregation.  *See, e.g.*, *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 717 (1871) (where the underlying suit was filed seeking an answer to the "question as to which of two bodies shall be recognized as the Third or Walnut Street

16

Presbyterian Church"). Because such controversies almost always involve questions of church doctrine or governance, civil courts have, at most, a limited role. As the United States Supreme Court has explained, civil courts

> have no power to revise or question ordinary acts of church discipline, or of excision from membership. We have only to do with rights of property. As was said in *Shannon v. Frost*, we cannot decide who ought to be members of the church, nor whether the excommunicated have been regularly or irregularly cut off. We must take the fact of excommunication as conclusive proof that the persons exscinded are not members. But we may inquire whether the resolution of expulsion was the act of the church, or of persons who were not the church and who consequently had no right to excommunicate others.

*Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139-40 (1872).

The present case differs from this classic presentation in that Shalom does not claim to represent the "true" PCUSA. To the contrary, Shalom, despite at least some conflicting evidence, claims that it is not now *nor has it ever been* a member of PCUSA. Recognizing that it may not hold true in every case, it certainly is more likely that the question of whether a church or person has *ever* been a member of a larger religious organization can be resolved on neutral principles of law than determining which group of competing factions represent the "true" church.[13]

Our recognition that cases such as the present case can often be decided on neutral principles of law cannot be construed as a holding that all of them (or even this one) can be. It can be said, however, that given the disputed record in this case and the limitations imposed by the summary judgment posture, neither the circuit court nor the Court of Appeals definitively

---

[13] To conclude otherwise could lead to all manner of church-related mischief, potentially allowing the highest tribunal of a hierarchical church to declare that a mere passerby was a member simply by the act of walking by the church's property. Suffice it to say that neither the passerby nor civil courts would be bound by such a conclusion.

could answer the question of Shalom's membership or determine whether that question could be answered without resort to matters of religious doctrine or invading church governance.[14]

Resolving these issues will require a full presentation of evidence. Such a presentation will allow a determination as to whether weighing the evidence necessarily requires involving civil courts in matters of dogma and church doctrine. Furthermore, it will allow a factfinder the opportunity to resolve genuine issues of disputed facts. Accordingly, we remand the case to the Court of Appeals with instructions for that court to remand the matter to the circuit court for further proceedings consistent with this opinion.

### III. CONCLUSION

Given the nature of the dispute between the parties, the arguments raised by the parties, and the recognition of the need to avoid becoming involved in matters of dogma, doctrine, or church governance, both the circuit court and the Court of Appeals understandably focused a great deal of attention on issues related to ecclesiastical abstention and the limitations on civil courts resolving disputes among religious actors. Unfortunately, this focus on the ecclesiastical trees caused each court to miss the summary judgment forest. Given the record on summary judgment, it is clear that there remains at least one genuine issue of material fact in dispute, and therefore, summary judgment for neither party was appropriate. Thus, the circuit court erred in granting Shalom's motion for the same. Similarly, the state of the record on summary judgment

---

[14] We note that, in reaching its conclusions, the Court of Appeals placed great weight on Shalom purportedly filing the Synod Complaint, which asserted it was a member of PCUSA and sought a ruling from the ecclesiastical tribunal. Given conflicting evidence of membership at the summary judgment stage and the fact that the ecclesiastical tribunal apparently questioned whether Shalom actually was a party to the Synod Complaint, *see* n. 9 *supra*, any such conclusion regarding membership based on the Synod Complaint was, at the very least, premature. It would be ironic indeed if, in an attempt to defer to the ecclesiastical tribunal, the Court of Appeals did not credit a potential finding of that tribunal that Shalom did not authorize the very filing upon which the Court of Appeals relied.

18

precluded the Court of Appeals from concluding that resolution of the dispute between the parties necessarily required a civil court to inappropriately invade matters of internal church governance or doctrine.

Neither determining whether the membership question can be resolved based on neutral legal principles nor potentially determining whether Shalom was, in fact, a member church of PCUSA properly could be addressed on this summary judgment record. Each determination requires a fuller examination of the evidence and the potential resolution of material facts that are in dispute. Accordingly, we remand the case to the Court of Appeals with instructions to remand the matter to the circuit court for further proceedings consistent with this opinion.

*Reversed and remanded.*